United States v. San Juan Chambers. Good morning. May it please the court. I'm Joshua Dreytel, here for Appellant Antoine Chambers. When I tell the story of what happened at trial in this case to either laypeople or lawyers, their answer is always, wow, that's a Perry Mason moment, which is shocking in the sense of experience, but what was more shocking to people is how Mr. Chambers could be convicted in this case, in a case in which the district court before trial identified identity as the material issue, the single material issue at the trial, and in which the government started off with a case purporting to have two eyewitness identifications and essentially going to the jury without any, and instead a . . . You have a point right. I mean, I understand that the one was stricken and the jury told to disregard it, but with respect to the other, would the jury have been allowed to credit the original testimony on direct, the identification, and to discredit the recantation? I think as a practical matter, no. The recantation occurred on redirect. It was not undermined in any respect by the examining prosecutor of that witness. That's the way it was left when the witness left the stand that it . . . There was no charge given to the jury on whether it could or could not consider that evidence? There was no charge, Your Honor. Right. So do you have any law that says that where a witness testifies inconsistently, the jury can't credit one and not the other? I mean, I completely understand your concern about the circumstances in which this arose, but I wasn't sure that as a matter of law, the jury couldn't have credited the ID and not the recantation. Your Honor, I think this case is so unusual, I don't know that there is another case that would present the same . . . particularly one that went up on appeal, because I think they're all acquittals, is probably the problem. And, you know, in the initial identification in court, the witness admitted it's a no-brainer. There's one African-American person sitting at the defense table. She acknowledged on the cross. And if you look back, and this gets into the other points as well . . . But she had a fair opportunity to identify him. I mean, he took off his mask when she was riding with him in the car. But she never identified him before trial. She said it kind of looked like him. I'm talking about that initial identification that Judge Radich did. But she didn't make it. But she didn't make it. But she identified him in court. After about nine months, after . . . no, more than that, I'm sorry, about a year and a half after the incident, after being . . . Those would all be questions for the jury, yeah. But also in the context of . . . but she acknowledged that . . . but if you look at the Biggers, in the context of Biggers, the factors really turned on their head. Because when she has an opportunity during the course of her testimony, not in the first ten minutes of her testimony when she's looking and finally says, oh, yeah, that's him because he's the defendant, he's obviously the defendant, but when she has an opportunity over the course of a cross-examination and redirect to look at him and then says, you know, it's not him, it's not him, she says it twice, she gives an articulate reason as to why it's not him, if you . . . and this . . . and again, it gets into the other points, the question of the Wade hearing or the lack of a Wade hearing and the Brady issue, because . . . Right. . . . Right. And to . . . Yes, Your Honor, I'm sorry. And I'll concentrate on the surgency first, which is you have these tenuous . . . what you have at the start is a case that's prosecuted as a case with two IDs and a series of corroborating inferences that are circumstantial and tenuous on their own. And what you end up with going to the jury is a series of these tenuous inferences that are weak on their own and never establish what they portend to . . . what they purport to establish, because what you have is, for example, the government . . . you know, they cite the phone records, but no one ever established that it was Mr. Chambers' phone at that time. No one ever established that Mr. Chambers was at any location for the cell site, that he was ever in the car . . . Well, the first sentence links him to the name Twizy, and then his own statement acknowledges that he used the other phone identified as Twizy in the man's, you know, own cell phone records. So, I mean, those two links, and then you've got the license plate . . . But we don't have any . . . The circumstantial evidence, it seems to me, is problematic for you. But the license plate is . . . it's another . . . it's a New York plate, according to the government's witness. It's an Acura, according to the government's witness . . . witnesses. It's an Acura, according to the police . . . to the detective's initial alert that he puts out is an Acura. This is not an Acura. This is a Honda. And so, it doesn't relate . . . Does she get four numbers and two letters on the plate? No, I think she just gets two numbers, Your Honor, or three numbers, but the . . . Four numbers. Four numbers. Okay. But the thing is, she says it's a New York plate, and also the . . . you manipulated this case so demonstrably. This is a guy with a history of before and after in this case . . . Were they identifying the hammer when they found the car? He didn't identify it. He said it could be. It's a generic hammer. It was a hammer . . . we could go out and get one right now, the same exact hammer. No forensic evidence, no . . . nothing that connects Mr. Chambers to it. Zero. Well, again, you're talking about the circumstantial evidence that the car in which the victim is assaulted. But it's a hammer. It's not necessarily the weapon, but also . . . Right, but he doesn't have a saw, a blackjack, anything else. He has a hammer. It's an extraordinary coincidence that that is the weapon of choice for the assault. But, Your Honor, all of these things are . . . they all presume that there's some connection with Mr. Chambers to the event that occurred. There's no connection of him being in the car. There's no connection of him being there. There's no connection that Mr. Brown is part of the robbery. So all of the phone connections don't connect to the crime because they . . . the government's . . . the only thing they have about Mr. Brown is that somehow . . . that he apologized. Learning that they'd been robbed, he said, I'm sorry. He didn't say, I'm sorry I did it. I'm sorry. Who wouldn't say they're sorry that something happened to someone like that? Is it his home that the victims first come to? They wait outside. And then when the . . . when Berea is leaving, they rush in. That's how they get Berea, the two assailants who were on this video. At his home, at Brown's home? Yes. Okay. But all of these things . . . I mean, if you take out the ID part of it, this case . . . If you take out the what part of it? The ID part of it. There's no case. You're pointing us to a case that says you take out that ID. But if we're looking at the evidence, even in the light most favorable to the government, you have a witness who recanted. I don't think you could ignore it. This is . . . It's not also evidence, but maybe I'm mistaken that during the either direct or redirect, her prior identification of his chambers came in and was before the jury. Yes, and that was error, Your Honor, as well. I mean, part of the problem in this case was the lack of a wait hearing. This should never have gotten to the stage where we had witness recanting when she finally gets a look at . . . Why should her prior statement not have come in? I understand the daughters, and that was excluded in the end, but why should the victim's statement . . . Because it was the product of a suggestion, again, by the detective. How? The detective . . . First, she did not pick Mr. Chambers out of the first array. Then he does a manual array, and this isn't in our brief, but it's in the record. He does a manual array. Instead of by the computer, he puts Mr. Chambers in the same spot as he did in the first array, in an array that he has created, not through the computerized NYPD system. . . . photograph, and I think you'd be hard-pressed to argue that it was obvious that it was the same person. So . . . But then she says . . . . . . case law that says that even the same photograph can be put in a second array. So . . . But there are other elements to it. Let's get to those. The other is that she says, but he had a teardrop tattoo, and the detective says to her, forget the teardrop tattoo. So then she picks out Mr. Chambers. And then she doesn't say . . . Nobody in the photographs had a teardrop tattoo. So at most, it might have been a statement that was more likely to prompt an I.D. as opposed to, you know, she shuts the book on the photograph, but it doesn't tell her who to pick. But it wasn't even an I.D. because what she wrote on the back is kind of . . . Yeah, but that goes to the jury. No, but I think that should have been part of a weight hearing as to whether there really was a pretrial I.D. She shouldn't be allowed to testify to a pretrial I.D. when she says it kind of looks like him, not that's him. Let me ask you just a slightly different question on a different topic involving the cell site location information. Why does your client have standing? Your Honor, that's an issue. And that's an issue that I think is ultimately going to go up to the Supreme Court. So I wanted to preserve it. I realize that there are obstacles for us, but I felt it was necessary. You mean obstacles resting in Second Circuit? Yes. Yes, Your Honor. Yes. Because your client failed to say that it was his phone? Correct, Your Honor, because it wasn't . . . And that was the government's position? Yes. Correct, Your Honor. Thank you. I know you want to reserve some time. Let's hear from the government. Thank you, Your Honor. May it please the Court, my name is Negar Tekye, and I am an assistant United States attorney in the Southern District of New York. Pardon my voice. I represented the government in the district court and also on appeal. Mr. Chambers was convicted of robbery and kidnapping after a fair trial. It was not a perfect trial.  It's an I.D. case in which you have two I.D.'s. One is completely struck from the jury's consideration, and the other is a woman who testifies on direct and then recants on redirect. Do you think that if the witness had I.D.'d the defendant from a photo spread and then recanted, you could have called her as a witness? I mean, really, it's just another way of asking the question I put to Mr. Torello. What do you think the jury could do with testimony in terms of . . . Could it credit the direct testimony and reject the redirect? Your Honor, Ms. Torello's . . . the jury had before it Ms. Torello's initial in-court . . . Could it have credited her direct testimony? and rejected the recantation? Yes, as Judge Schofield found that the jury could have credited both Ms. Torello's in-court identification on direct, her prior out-of-court identification of the defendant in which she circled his picture in a photo array, signed her name under it, and the detective contemporaneously wrote that she said, it kind of looks like him. And more or less discounted the recantation? It could have. She was under, as Judge Schofield, who witnessed this transpire under immense pressure. She was very emotional. She took multiple breaks during the course of her testimony, both throughout the course of the testimony. And what was clear, and what is clear from the record, is that Mr. Chambers . . . there were multiple pictures of Mr. Chambers in the record. He looks different in almost every one of them, as the court recognized earlier. It's hard to discern whether the pictures of him in front of her at that moment, which were at least one photo array, and the person sitting in front of her at court were the same person. And that may have been what led her to recant. It may have been the circumstances of the pressure that she was under. It may have been that she was shown 3500 material with her personal address, her current address on it, on cross-examination. That's not in the record. I mean, the only thing that seems to support when she recanted that she was nervous, that she was afraid of her future or her family's future from identifying this guy, was the first questions on redirect were, do you want to be here today? And she said, right now, no. But the rest of it was, he doesn't look like the same guy. So what kind of inference can you draw from that as to why she recanted? The jury was entitled to draw whatever inference that it could. The jury had before it her prior out-of-court identification, which she had not recanted. What did the government say at summation about the recantation? The government said that the, described the factual events that had transpired during the course of the trial, during her testimony, that first, she unequivocally identified the defendant as the individual who was one of the perpetrators of the robbery and kidnapping. Then, she confirmed her prior out-of-court identification of the defendant, which happened on June 6, 2013, nine weeks after the robbery and kidnapping. And then, on redirect, after enduring a difficult cross-examination, recognized by Judge Schofield that it was a difficult cross-examination, she recanted her in-court identification. But that was at the prompting of the prosecutor. And... Can you explain to me how that happened? The questioning prosecutor wanted to clarify the in-court identification and to understand, and to clarify, especially after cross-examination, when Mr. Dreitel made several points regarding the in-court identification. For example, the point he just made now, that it was a no-brainer. Wanted to confirm what, and I was not the questioning prosecutor, but I think would have wanted to confirm and ask the appropriate questions to confirm whether she was, in fact, still identifying the person sitting in court today. And she wasn't. And she said no. But the jury had before it all of those identifications. And I think, more important... So, I can assume that this came as a surprise to the prosecutor when she recanted, right? In fact, it did. Okay. So, the problem with the case as a whole is there seemed to have been a lot of surprises for the prosecution. I gather that the facts that Mr. Dreitel relies on with respect to his weight-hearing argument, all facts that were not made known to the district judge before trial because the government wasn't aware of them, the prosecutor, your office, right? About the multiple photographs shown to the daughter, about the statements that were made to the victim. Am I right that the government didn't know any of those things in order to tell the district court about them? The government knew and made disclosures prior to trial with respect to what it had known. Right. So, the fact that she was told, ignore the tattoo, you didn't know that before trial, right? Because as I understand it, it wasn't disclosed before trial. Have I misunderstood something? To be completely candid with you standing here right now, I cannot recall that fact. I don't want to misstate the record. Well, the daughter's statements about the fact that she was shown multiple photographs on multiple times, that wasn't disclosed. That was the reason Judge Schofield tossed her testimony, right? The daughter's statements differed in two primary respects from her prior interviews and prep sessions with the government as the government had met with her multiple times prior to trial. First, she said that she had reviewed multiple newspaper photographs on her own of the defendant prior to making the second out-of-court identification, as opposed to the one that the government was aware of and disclosed to the court and defense counsel several months before trial. Second, she said that she was shown a single mugshot photograph of the defendant while at the precinct. That was the first time that the government, the defense counsel, the defendant, the court, anybody had become aware of that. That happened on cross-examination. There were two people who knew it, the witness and the officer. I'm hard-pressed to understand how the prosecutor doesn't learn these facts in the course of preparing these witnesses. Now, you said you were counsel below but not sole counsel, so I ask this generally. How does the office not learn these facts  The record is clear that, and I was the prosecutor who questioned Ms. Torres, the daughter, so the record was clear that we met with her multiple times and asked her about the identification procedures multiple times, took notes on her answers with respect to those identification procedures each time that we met with her. And so that's why it was a surprise to us. But you didn't see that there was a deficiency in these preparations because you didn't learn facts that came out when she was on the stand. We asked her the questions multiple times. I don't know that it was a, if we had to do it over again, we would have asked again and again and again and again. The other problem... It took one question during the trial to elicit precisely that answer. Well, and we asked her on direct examination, prior to making your, prior to signing the photo array that she signed on June 6, 2013, were you shown any other photographs? And in response to that question, she said that she was shown, on direct examination, in response to that question, she said that she was shown the newspaper photograph of the defendant. She did not, and that was an open-ended question, it was a non-leading question, and she did not then say, as she did for the first time on cross-examination, that in addition to the newspaper photograph that she was shown, she was shown the single shot at the precinct. But neither did the officer tell you that? And you asked him, presumably, tell me everything you showed her. The officer did not tell us that, and that is also clear from the record. Can I ask you about another topic, and that is, how do we connect the 6130, those digit phone, that phone, to the defendant? Was there any evidence of that? Yes, Your Honour. On the phones that were seized from Brown, the defendant's co-conspirator, there were two contacts listed for Twizy with four phone numbers. One of those phone numbers was the phone number ending in 6130, which the defendant's friend, Kentrell Ferguson, testified on the stand, was the phone number that he had used and knew of being used by Twizy. When asked to identify who Twizy was, he said, Antoine, and that was the defendant in the courtroom. So that ties the 6130 number directly to the defendant. And what ties him to the home? Multiple things. First, the defendant's girlfriend and son, excuse me, I would just like to correct one thing. Your Honour asked about the 6130 phone number. I think I misstated. There was a phone number on Kentrell Ferguson's phone under the name Twizy that also matched a phone number under Tyrone Brown's phone under the name Twizy. It was not the 6130 number. It was a different phone number. But the contact names matched. And we briefed this earlier. So if I am incorrect about the exact record site, that's my apology. There are two Twizy numbers in Brown's phone, right? There are four Twizy numbers in Brown's phone. And one of those numbers matched a Twizy number in Kentrell Ferguson's phone. The defendant's girlfriend resided at the Barnes Avenue address. The defendant's child resided at the Barnes Avenue address. The defendant's cell phone went back to the Barnes Avenue address immediately after the robbery and kidnapping. And the cell site evidence shows that. When the agents interviewed the landlord of the Barnes Avenue address, he confirmed that Zeporia Dunbar, the defendant's girlfriend, lived there with her boyfriend, that being the defendant. There were multiple pieces of evidence that tied him to the 4782 Barnes Avenue address. Is it your position with respect to the identification facts that were disclosed only at trial, that they would not be sufficient to have warranted exclusion had they been made known to the district court in advance? That is not our position, Your Honor. Tell me what the government's position is. Hindsight is always 20-20. And we may have taken a different position had Ms. Torres explained to us what she explained on cross-examination were the identification procedures. There were multiple avenues that we could have pursued, and we may not have taken the position that a weight hearing, with respect to Ms. Torres, was not necessary or not required. Aren't we supposed to consider whether or not the district court abuses discretion in connection with denying a weight hearing with the full benefit of hindsight? The district court struck the record with respect to Ms. Torres' testimony, both as it came out on her testimony and as it came out on Detective DeLoren's. So the argument is that no harm to the defendant because it was struck and we presume the jury followed the instruction? We have to presume that the jury followed the instruction. They were instructed multiple times, and they even received the transcripts of the testimony showing exactly what they could consider from Ms. Torres' testimony, what they could not consider. The jury deliberated over five full days. They asked for multiple witnesses' testimony. They had before them the cell site records, the phone records. They had before them various pieces of evidence that they trailed through in the course of those five days, and significantly, as Judge Schofield held, even setting aside, even ignoring any of the eyewitness identification testimony, the jury's verdict was supported by the circumstantial evidence in this case, which was strong and sufficient to allow any of them, the rational triers of fact, to come to the conclusion the defendant was guilty beyond a reasonable doubt. Thank you. Thank you. Is there time? Yes, thank you. With respect to Ms. Troella, in the sense of, and the Court asked, and I think Your Honor asked a question also about how this came out on redirect. And again, it goes back to what I said, that the bigger factor is really on their head in this case because when she finally had an opportunity to view Mr. Chambers and not a series of different photographs in which the government says he looked different all the time, but rather had a chance to look at the live person, she says, he says, I just kept looking. It's not him. So her ability to see Mr. Chambers during trial was really what turned the tide with respect to what had been a series of different photographs and a complete manipulation by the detective with respect to the question of ‑‑ There was no recross though, right? No. I hope I know enough not to do that. But also, Your Honor asked about when everyone learned about the issue of the, forget about the teardrop, and I went back to look, and it's actually also in redirect. So it was not in the 3500. You know I would have used it if it had been in the 3500. So this is something that's obviously part of the prosecution team. This detective is, and the government as a whole, is charged with that knowledge. And that goes to our Brady. Part of the argument, you mentioned figures, is that it all came out at trial. And that's the problem, Your Honor. And, you know, with respect to, you know, the Wade hearing, the government asked for a Wade hearing during the trial, which was, you know, ironic, but at the same time too late. This was after the court had, while the court was considering whether or not to strike Ms. Torres' testimony. And in that regard, it only establishes further that the cart went before the horse in this sense the trial went before a determination as to the reliability or accuracy of these identifications. Suggestive practices require exclusion if there's a possibility that they led to an unreliable identification. And in this case, we're making that determination in the case of a witness who testified one way on direct and a different way on redirect. I understand that. But are you, I'm still not sure I understand quite how you think the teardrop statement did anything more than make her look hard at the six pictures in that spread. I'm not sure how it focused her on the defendant particularly. Because she said that it had, she wouldn't have focused on it at all. If you look at the prior, if all of the. Perhaps made any ID, but it didn't point her to who to identify. And in that sense, I'm not sure why the district court couldn't have considered, well, then it's something for the jury to decide whether among the six people she would have made an unreliable identification of the defendant. It essentially dismissed her independent recollection and created a whole new recollection of someone without a defining mark that she always insisted the assailant had. The robber had. The client did not have such a mark, right? Correct, correct. One of the other participants did. But she knew who that was. No, no, I understand that. She identified. My point is there was somebody who had a face tattoo. Yes, but she said that the tall guy, the second robber, had a teardrop tattoo. If you look at the cross, and I said, you think that today? And she said, yes. Why couldn't an officer make that statement? I mean, you do get to make statements like don't consider a beard, don't consider the length of hair. Who knows when the photograph was taken relative to when somebody would have had a tattoo applied. So why was the statement impermissible? It's part and parcel of the whole manipulation by this detective between the manual array, that, what he did with Torres, and the government, the court asked about preparation. We would consider the Torres statement in considering the victims because we have to consider what was done to influence her mind. That's her mom. Are you saying that the victim knew what was done with respect to her daughter? I don't know. We never got into that because, you know. Then we can't assume it either. But at a weight hearing, that would be an appropriate. There was no suggestion of that. You didn't develop any record on that. Okay. Anything else? With respect to the government's preparation and its responsibility for the integrity of the evidence, this is a detective who had a prior finding by Judge Batts that he was not credible, who Judge Schofield said was not credible and criticized the government with respect to the search of a co-defendant's house, Tyrone Brown's residence, with respect to statements in the affidavit. So there was real notice here and a complete lack of an opinion. Did you make a Brady challenge to this court? Yes. Excuse me? Did you make a Brady challenge to the defense? Yes. Yes, we did, Your Honor. In our post-trial motions, we did. This is basically. Post-trial. Also pre-trial. Pre-trial, we asked for more disclosure with respect to what was going on with the ID's. We weren't getting a hearing. We were getting a series of disclosures, ultimately during trial even. All right. Yes. Thank you very much. We're going to take the case under advisement.